## FOLGER *v.* UNITED STATES.

An assistant treasurer of the United States to whom, without prepayment therefor, the Commissioner of Internal Revenue furnishes for sale and distribution sealed packages of adhesive stamps, is not entitled to commissions or extra compensation for selling them.

APPEAL from the Court of Claims.

The facts are stated in the opinion of the court.

*Mr. Walter H. Coleman* and *Mr. George F. Comstock* for the appellant.

*The Solicitor-General, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

In the month of June, 1866, some correspondence passed between Van Dyck, then assistant treasurer of the United States at the city of New York, and the Commissioner of Internal Revenue, as to whether the former should be required, in addition to his ordinary duties, to assist in the distribution of adhesive

stamps among those desiring to purchase them for their own use. An official communication from the Secretary of the Treasury to the assistant treasurer, under date of July 2, 1866, shows upon its face that the latter officer objected to being required to perform any such services. In that communication the Secretary says : —

" The Commissioner of Internal Revenue has referred to me your recent letter to him in relation to the distribution of revenue stamps in the city of New York. I am aware that the cares and responsibilities of your position are burdensome, and I should not think of increasing them were it not for the seeming necessity of so doing. The adhesive revenue stamps are all printed in Philadelphia, and it is deemed imprudent to multiply the places of their production. It is indispensable, however, that every facility shall be given by the government for their purchase and distribution. The consumption of stamps in New York alone is very large, while the amount which. is naturally distributed from that city is no small part of the supply for the whole country. It seems to me very advisable, therefore, because of their great value, that they should be kept, as other property of the government is kept, in the possession of the government itself until actual sale. I am aware that the distribution will require a room set apart, perhaps, exclusively for that purpose, and some additional clerical force ; but reasonable prudence and a proper regard for the public. convenience, as I have suggested, constrain me to ask your critical consideration of the subject. It may not be improper for me to add that the assistant treasurer at San Francisco is employed in the distribution of stamps, and that I am disposed to ask the same service of the several other assistant treasurers in different parts of the country."

In a subsequent communication, dated Sept. 11, 1866, the Secretary said : —

" It has been deemed proper, as an additional means of facilitating the distribution of internal revenue stamps, that packages containing such denominations of stamps as are in most general demand should be placed in the hands of the assistant treasurers of the United States and some of the designated depositaries. Printed circulars will be furn'shed to you, specifying the contents and the cash value of each package, and the packages are to be sold, with seals unbroken, at such value, which will be stated upon each package. The amounts received from the sale of these packages should

be transmitted to the Commissioner of Internal Revenue, in the form of certificates of deposit, daily or weekly, as may be most convenient."

At a later period Charles J. Folger became assistant treasurer of the United States at the city of New York. Between Nov. 16, 1869, and the twenty-second day of July, 1870, inclusive, in obedience to the instructions and requirements contained in the foregoing communications, and without any application upon his part, he was furnished by the Commissioner of Internal Revenue with sealed packages of adhesive stamps for sale and distribution. He was not required to give, and did not give, any bond with reference to them. Upon each package, as it came to him, was marked as well the aggregate face value of the stamps contained in it for delivery to purchasers, as the amount of them of like kind, to be paid out to purchasers, as their commissions under the regulations established by the Commissioner. He was directed to sell and deliver the packages without disturbing their seals.

The commissions, at the time allowed by such regulations, to purchasers of *common* stamps were: two per cent in purchases of $50 or more, three per cent on $100 or more, four per cent on $500 or more, and five per cent on $1,000 or more.; while as to *proprietary* stamps, the commissions allowed, by statute, were as hereinafter stated.

His sales of common stamps from Nov. 16, 1869, to July 22, 1870, inclusive, amounted to $3,642,754.60, and of proprietary stamps, to $31,589.54. These sums, respectively, included the amount, in stamps, which he passed over to purchasers as their commissions. Upon retirement from office his accounts were settled and adjusted at the Treasury Department, without any assertion of a right to commissions for himself. In that settlement he was allowed, or credited with, all payments made by him, in stamps, of commissions to purchasers. He derived no personal advantage from the sales.

He brought this action on the first day of May, 1875, to recover from the United States the sum of $184,934.95, to which he claims to be entitled as commissions upon such sales. His claim was denied, and judgment having been entered for the government, he appealed.

By sect. 161 of the act of June 30, 1864, c. 173, providing internal revenue to support the government, to pay the interest on the public debt, and for other purposes, it is provided, among other things, that —

"The Commissioner of Internal Revenue be, and he is hereby, authorized to sell to and supply collectors, deputy collectors, postmasters, stationers, or any other persons, at his discretion, with adhesive stamps, or stamped paper, vellum, or parchment, as herein provided for, in amounts of not less than fifty dollars, upon the payment, at the time of delivery, of the amount of duties said stamps, stamped paper, vellum, or parchment, so sold or supplied, represent, and may allow, upon the aggregate amount of such stamps, as aforesaid, the sum of not exceeding five per centum as commission to the collectors, postmasters, stationers, or other purchasers; but the cost of any paper, vellum, or parchment shall be paid by the purchaser of such stamped paper, vellum, or parchment as aforesaid: *Provided,* that any proprietor or proprietors of articles named in Schedule C, who shall furnish his or their own die or design for stamps, to be used especially for his or their own proprietary articles, shall be allowed the following commission, namely: on amounts purchased at one time, of not less than fifty dollars nor more than five hundred dollars, five per centum; on amounts over five hundred dollars, ten per centum." 13 Stat. 294.

Sect. 170 of the same act declares, —

"That in any collection district where in the judgment of the Commissioner the facilities for the procurement and distribution of stamped vellum, parchment, or paper, and adhesive stamps, are or shall be insufficient, the Commissioner is authorized to furnish, supply, and deliver to the collector and to the assessor of any such district and to any assistant treasurer of the United States, or designated depositary thereof, or any postmaster, a suitable amount of stamped vellum, parchment, or paper, and adhesive stamps, without prepayment therefor, and shall allow the highest rate of commissions allowed by law to any other parties purchasing the same; and may in advance require of any such collector, assessor, assistant treasurer of the United States, or postmaster, a bond with sufficient sureties to an amount equal to the value of any stamped vellum, parchment, or paper, and adhesive stamps, which may be placed in his hands and remain unaccounted for, conditioned for the faithful return, whenever so required, of all quantities or

amounts undisposed of, and for the payment monthly of all quantities or amounts sold, or not remaining on hand.. And it shall be the duty of such collector to supply his deputy with, or sell to other parties within his district who may make application therefor, stamped vellum, parchment, or paper, and adhesive stamps, upon the same terms allowed by law or under the regulations of the Commissioner, who is hereby authorized to make such other regulations not inconsistent herewith, for the security of the United States and the better accommodation of the public, in relation to the matters hereinbefore mentioned, as he may judge necessary and expedient. And the Secretary of the Treasury may from time to time make such regulations as he may find necessary to insure the safe keeping or prevent the illegal use of all such stamped vellum, parchment, paper, and adhesive stamps." Id. 297.

Sect. 161 plainly provides for sales by the Commissioner, while sect. 170 authorizes him to furnish and supply certain officers with stamps for sale to others. Where stamps were purchased either directly from the Commissioner of Internal Revenue, for cash, under sect. 161, or from one of the officers to whom they were furnished for sale and distribution under sect. 170, the purchaser, it is conceded, was allowed commissions according to the rate or scale established by the regulations of the Commissioner. Touching the particular sales made by the appellant, the purchasers of common or general stamps were entitled, respectively, to five per cent commissions, and the purchasers of proprietary stamps to ten per cent. There can be no doubt of this, since his petition distinctly alleges that his sales of common stamps were in amounts of not less than $1,000, and of proprietary stamps in amounts exceeding $500. If, therefore, it be suggested that he was entitled to the difference between the highest rate or per cent allowed by the government (five per cent in purchases of common stamps, and ten per cent in purchases of proprietary stamps), and the amount paid over by him, in stamps, to purchasers, the obvious answer is, that there was in this case no such difference. This interpretation of the statute, we may observe, could, therefore, be of no practical value to him. His contention — and upon no other ground could his claim be sustained — is, that, without reference to the rate of commissions which purchasers

received, although it may have been the highest allowed, he was, nevertheless, given by the statute, to his own use, and as his personal allowance or compensation for distributing stamps, under sect. 170, the *highest rate* of commissions allowed to any one buying from the Commissioner of Internal Revenue.

For instance, upon the theory advanced by appellant's counsel, a purchaser, from the Commissioner of Internal Revenue, of common stamps to the amount, at one time, of $1,000 or more, would be allowed five per cent as commissions, payable in stamps (which, in such cases, would be the full extent of the government's loss), while upon a sale, through an assistant treasurer of the United States, to the same purchaser of the same stamps, in sealed packages, the government would lose altogether ten per cent in commissions, — five per cent to the assistant treasurer, and five per cent to the purchaser; that is, double commissions. In other words, according to that construction of the statute, the government held out an inducement to officers, named in sects. 161 and 170, not to become themselves purchasers, for cash, of stamps for sale and distribution in their respective localities (as they might under sect. 161), but to receive them, under sect. 170, and thereby, without advancing any money, secure for themselves (outside of what the purchasers from them would be allowed), the highest rate which the law allowed in purchases directly from the Commissioner.

We cannot give our assent to any such construction of the statute. The officers, named in sect. 170, were charged, at the outset, with the value of each sealed package of stamps delivered to them for distribution. In the settlement of their accounts they were entitled to be credited with the amount of stamps unsold and returned; with the sums received upon sales, and paid over to the government; and, also, with the value of the stamps placed in the sealed packages, for delivery to purchasers as commissions allowed *to them*. In this way they were relieved from the responsibility assumed when they were supplied with stamps for distribution under sect. 170. The statutory direction that the Commissioner, in such cases, " shall allow the highest rate of commissions allowed by law to any other parties purchasing the same," was an awkward mode

of expressing the idea that the same commissions, up to the highest rate, should be allowed in purchases under sect. 170, as under sect. 161, — that is, that those wishing stamps might purchase from the officers named in sect. 170 at the like rate, even the highest, accorded to " any *other* parties *purchasing* the same " stamps, for cash, directly from the Commissioner.

As to assistant treasurers distributing stamps under sect. 170, we are of opinion that Congress did not intend that they should receive any compensation whatever for services of that character, — certainly not in any case where the commissions paid to those who purchased from such officers were as large as the highest rate prescribed in sales by the Commissioner, for cash, under sect. 161. It was for the better accommodation of the public that the Secretary of the Treasury required assistant treasurers to aid in the distribution of adhesive stamps. The communications addressed to the assistant treasurer of New York, announcing his purpose to adopt that course, show upon their face that the Secretary had no expectation thereby of increasing the loss, in the way of commissions, which the government would sustain upon sales of stamps. He believed that he had the power to impose upon assistant treasurers the duty of distributing internal revenue stamps.

The conclusion we have indicated is in line with the settled policy which has existed upon the subject of extra compensation to officers having fixed salaries or pay, especially in regard to assistant treasurers of the United States.

By an act approved March 3, 1839, c. 82, making appropriations for the civil and diplomatic service, it was declared, that "no officer in any branch of the public service, or any other person whose salaries, or whose pay or emoluments, is or are fixed by law and regulations, shall receive any extra allowance or compensation, in any form whatever, for the disbursement of public money, or the performance of any other service, unless the said extra allowance or compensation be authorized by law." 5 Stat. 349. In a subsequent act of Aug. 23, 1842, c. 183, this prohibition against extra compensation to officers with fixed salaries was somewhat enlarged, and this provision was inserted : " No officer in any branch of the public service,

or any other person whose salary, pay, or emoluments is, or are, fixed by law or regulations, shall receive any additional pay, extra allowance, or compensation, in any form whatever, for the disbursement of public money, or for any other service or duty whatsoever, unless the same shall be authorized by law, and the appropriation therefor explicitly set forth that it is for such additional pay, extra allowance, or compensation." Id. 510. And at the same session of Congress, by an act approved Aug. 26, 1842, c. 202, it was declared that "no allowance or compensation shall be made to any clerk or other officer, by reason of the discharge of duties which belong to any other clerk or officer, in the same or any other department; and no allowance or compensation shall be made for any extra services whatever, which any clerk or other officer may be required to perform." Id. 525.

We come, then, to the act of Aug. 6, 1846, c. 90, under which the appellant was appointed to office, providing for the better organization of the treasury, and for the collection, safe-keeping, transfer, and disbursement of the public revenue. Among the duties imposed by that act upon assistant treasurers was that of doing and performing all duties as fiscal agents of the government which might be imposed by that or any other act of Congress, or by any regulation of the Treasury Department made in conformity to law; and, "also to do and perform all acts and duties required by law, or by direction of any of the executive departments of the government, as agents for paying pensions, or for making any other disbursements which either of the heads of those departments may be required by law to make, and which are of a character to be made by the depositaries hereby constituted, consistently with the other official duties imposed upon them." 9 id. 60. The same act fixed the salaries of the assistant treasurers, and declared : "And these salaries, respectively, shall be in full for the services of the respective officers; nor shall either of them be permitted to charge or receive any commission, pay, or perquisite, for any official service, of any character or description whatsoever." Id. 65. The foregoing provisions in the acts of 1839, 1842, and 1846 have been preserved in sects. 1763, 1764, 1765, and 3597 of the Revised Statutes. They were all in

force when the general revenue statute of 1864 was passed. Commenting upon the act of Aug. 23, 1842, this court in *Stansbury* v. *United States* said : " The law was passed to remedy an evil which had existed of detailing officers with fixed pay to perform duties outside of their regular employment, and paying them for it, when the government was entitled, without this double pay, to all their services. The law prohibited, and was intended to do so, the allowance of such claims as these, made by public officers, for extra compensa tion, on the ground of extra services." 8 Wall. 33, 37.

It will be observed that while the act of Aug. 23, 1842, allows an officer. having a fixed salary to receive additional pay, extra allowance, or compensation, if " the appropriation therefor explicitly states that it is for such additional pay, extra allowance, or compensation," the act of 1846 contains no such reservation in favor of assistant treasurers of the United States. As to those officers, the statute expressly forbids *them* from receiving " any commission, pay, or perquisite, for any official service of any character or description whatsoever." And so the law is to this day. Rev. Stat., sect. 3597.

Of course these provisions would not avail the government should Congress, by subsequent enactment, allow assistant treasurers to receive, outside of their fixed salaries, commissions, pay, or perquisites for extra services. But, in view of the established policy of the government, as shown in the statutes to which we have referred, the act of 1864 should not be construed as a departure from that policy. Its language does not clearly indicate an intention to allow assistant treasurers additional pay or compensation for such services as those which appellant performed. We are not satisfied that Congress had any purpose to alter the existing statutes in reference to the allowance of extra compensation to assistant treasurers, with fixed salaries. His services in connection with the distribution of adhesive stamps were of a character which, consistently with his other official duties, he might be required to perform. But if they were not, he was not entitled to compensation, because the statute does not explicitly state that he was to receive additional pay therefor.

The views we have expressed are further fortified by the twenty-fifth section of the act of 1864, which declares that "there shall be allowed to collectors, in full compensation for their services, and that of their deputies, a salary of $1,500 to be paid quarterly, and in addition thereto a commission of three per cent upon the first hundred thousand dollars, and a commission of one per cent upon sums above $100,000 and not exceeding $400,000, and a commission of one-half of one per cent on all sums above $400,000, such commissions to be computed upon the amounts by them respectively collected and paid over and accounted for under the instructions of the Treasury Department." According to the argument advanced by counsel for appellant, collectors, notwithstanding the foregoing provision, would be entitled to receive, for their services in distributing stamps, under sect. 170, compensation other and beyond that which sect. 25 of the same act declares shall be "in full compensation for their services." Such was not, as we think, the intention of Congress.

If an assistant treasurer wished to derive personal advantage or profit from the distribution of adhesive stamps, he was at liberty to do so by becoming himself a purchaser, for cash, directly from the Commissioner, under sect. 161. The stamps in that case would become his property, whereas, if received under sect. 170, they remained the property of the government until they were actually sold. By *purchasing* stamps for cash, in amounts of $1,000 and over, he would be allowed, as any other purchaser would be, five per cent as commissions, and upon sales in small amounts by him to others he could realize to his own use the difference between five per cent and the rate (whatever it was) at which the purchaser from him could have obtained stamps directly from the Commissioner. But when he received stamps, under sect. 170, for distribution, he could derive no advantage from their sale, certainly not in cases where the commissions allowed to the purchasers amounted, in sales of common stamps, to five per cent, and in sales of proprietary stamps to ten per cent. Congress never intended that the government should, in any contingency, lose on sales of adhesive stamps, by whomsoever and in whatsoever quantities made, more than five per cent of the face value of common

stamps, and more than ten per cent of the face value of proprietary stamps.

*Judgment affirmed.*

MR. JUSTICE FIELD, with whom concurred MR. JUSTICE BRADLEY, dissenting.

I dissent from the judgment of the court. I think that Mr. Folger was entitled to the difference between the five per cent given by the government and the amount he allowed to the purchasers.